IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TIA PARADIS,

                                                    OPINION AND ORDER
            Plaintiff,
                                                    16-cv-225-bbc
        v.

DAN NICHOLS, RICH DAVIDSON, GARY KNEISL,
MARC LETENDRE, MATT BROWN, CITY OF
SUPERIOR and DOUGLAS COUNTY,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        In this civil action for monetary relief brought pursuant to 42 U.S.C. § 1983, plaintiff

Tia Paradis contends that defendant Douglas County, defendant City of Superior and several

of their employees failed to provide appropriate medical treatment for her incipient frostbite

while she was incarcerated at the Douglas County jail. She also brings a state law negligence

claim against Douglas County. Now before the court are the motions for summary judgment

filed by defendants Dan Nichols, Rich Davidson and Douglas County (the county

defendants), dkt. #45, and defendants Gary Kneisl, Marc Letendre, Matt Brown and the

City of Superior (the city defendants), dkt. #49. Although plaintiff's injuries from frostbite

proved to be serious and permanent, she has failed to show that any of the defendants can

be held liable for them. Accordingly, I am granting defendants' motions.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed, unless otherwise noted.


## UNDISPUTED FACTS

### A. The Parties

Plaintiff Tia Paradis is a resident of Minnesota and a registered nurse who works in the heart and lung transplant cardiac unit at the Mayo Clinic in Rochester, Minnesota. She graduated in May 2015 with a degree in nursing from Winona State University in Minnesota.

Defendant City of Superior is a Wisconsin municipal corporation. At all times relevant to this case, defendants Gary Kneisl, Marc Letendre and Matt Brown were employed by the City of Superior Police Department as police officers.

Defendant Douglas County is located in Wisconsin, and the Douglas County jail is located in Superior, Wisconsin. At all times relevant to this case, defendants Dan Nichols and Rich Davidson were employed by the Douglas County Sheriff's Department as sergeants at the jail.


### B. Defendants' Training

#### 1. City police officers

In Wisconsin, the training of police officers is governed by state law. The state's Law Enforcement Standards Board sets minimum requirements for police officer training.

Defendants Kneisl, Brown and Letendre have met the state training requirements throughout their employment.

Defendant Letendre has a college degree and is certified as an emergency medical technician, firefighter and paramedic. In 2010, he completed course work to become a registered nurse and currently is in graduate school for emergency management leadership. Before becoming a police officer in 2012, Letendre worked in the dispatch center for a few years and served as a deputy medical examiner in Douglas County for one year. He is the SWAT medic and teaches the SWAT team on rescue tactics.

Letendre has had training related to frostbite and hypothermia and, as a paramedic, has treated people exposed to frostbite. He knows that frostbite is very difficult to identify in its early stages, that it takes time for visible symptoms to appear and that to stop frostbite from progressing, the victim has to be removed from the cold and not re-exposed to the cold. He also knows that it is generally a person's extremities that are most affected by frostbite. Dkt. #56 at 13.

Kneisl and Brown have not had any training in identifying frostbite. However, Kneisl knows that it is not possible to say what specific amount of exposure time or specific degree of coldness is required for frostbite to set in.

## 2. County jail officers

Jail officers receive medical training from the academy every two years during their employment. The medical training includes the identification of signs of frostbite, such as

severe discoloration of the skin, skin that is hard to the touch and complaints of pain. Both Nichols and Davison received the frostbite training through their employment and through the Red Cross. The Red Cross guide on frostbite and hypothermia states that "[f]rostbite and hypothermia are cold-related emergencies that may quickly become life or limb threatening" and that "[s]ignals of frostbite include – lack of feeling in the affected area; skin that appears waxy, is cold to the touch, or is discolored (flushed, white or gray, yellow or blue)." Red Cross, Frostbite and Hypothermia, March 2007 (accessed electronically at www.redcross.org on Jan. 30, 2018).

## C. Municipal Policies and Procedures

### 1. City of Superior

The Superior Police Department has a mandatory policy for insuring that detainees receive necessary medical treatment while they are in custody. If an officer notices an injury or if an arrested person complains about feeling pain or being injured, the officer must investigate the nature of the injury and the history of past illness to try to determine whether there is a current medical need. For example, when arresting someone, Kneisl does not conduct a physical examination, but if he notices an injury or if someone complains of pain, he is required to investigate by asking where the pain is located, what is causing it and how severe it is.

The Superior Police Department has the following "General Order" addressing medical treatment of arrestees:

406.01    Policy

A. The Department is responsible for ensuring medical treatment is given to any prisoner with injuries sustained before or during arrest and booking.

406.02    Procedure

A. It is the arresting officer's responsibility to ensure prisoner injuries are treated prior to releasing that prisoner from the officer's custody or incarcerating him.

   1. In the event of an apparent non serious injury and if the arrestee is to be released without incarceration, the officer will offer to drop him/her off at the hospital emergency room.

B. Such treatment will be routinely performed at the Superior Memorial Hospital unless the arrestee is transported to a Duluth hospital at the discretion of medical personnel.

C. If there is a medically trained person on scene, e.g., ambulance or fire personnel, that person may administer treatment to minor injuries before incarceration in the jail facility.

   1. The arrestee will be given the option of further treatment, and if so requested the officer will promptly ensure the arrestee is taken to a medical facility.

D. If ambulance personnel are available, they can be called to the jail to examine injured arrestees.

E. The arresting officer will ensure arrestees who have more serious injuries and are in obvious need of medical treatment will taken directly to a medical facility.

   1. If it appears there is a possibility of aggravating an injury by moving the person in a car, an ambulance will be called.

F. The officer will include in his offense report:

   1. description of the injuries;

2. an explanation of how the injuries were obtained. If the prisoner had prior injury, so state and explain.

3. photos of injuries;

4. treatment provided;

5. who performed the treatment, and

6. place, date, and time treatment was provided.

G. If the prisoner refuses medical treatment, this should occur in the presence of witnesses, preferably medical personnel. Include documentation of the refusal and persons present at the time of refusal.

H. Persons incapacitated from alcohol, drugs, mental disease or because of the injury will be checked by paramedics at a minimum and may be transported to the hospital if deemed prudent by the officer.

I. The Superior Police Department will not assume financial responsibility for medical treatment of arrestees.

2. Douglas County

Douglas County has a mandatory policy with respect to jail intake that includes an examination of past and present medical conditions. However, it has no written policy or procedure detailing what a jailer should do if he or she suspects that an arrestee has an injury. Defendant Nichols testified that if he suspected during the booking process that an arrestee had an injury, he would report it to a sergeant, note the injury on the medical intake form and contact the on-call nurse or a paramedic, depending on the circumstances. For example, if a prisoner arrived at the jail with obvious signs of frostbite, the jail would not

accept the prisoner into custody but would send the person to the hospital for medical treatment and "clearance."

The jail has a system in place for medical requests from detainees, who can submit written requests for medical care, and if there was an emergency need or some other circumstance that makes submitting a written request impractical, the officers will obtain immediate medical care for the detainee from the jail's medical services or by transporting the detainee to a hospital.

The jail has an electronic program system known as "Guard One" for monitoring detainees. Jail staff activate a button on the wall outside each cell after completing the check of the detainee. Jail policy requires officers to perform hourly well-being checks on detainees. In addition to recording their checks of detainees in the Guard One system, jail officers record additional information from their checks into a computer program.

### D. Plaintiff's Arrest and Pre-Booking

On February 13, 2015, plaintiff was a college student, visiting her boyfriend Connor Faupel in Superior, Wisconsin. That evening, plaintiff started drinking alcohol at her boyfriend's house sometime between 7:00 p.m. and 8:00 p.m. and then left with Faupel and his friends at 10:30 p.m. or 11:30 p.m. to drink at Shorty's Bar. At around 12:30 a.m., the group left to go to Norm's Bar. Over the course of the evening and into the early morning hours of February 14, 2015, plaintiff drank wine, beer and shots and became intoxicated.

Plaintiff lost track of her boyfriend at Norm's Bar and left on foot, hoping to find her way back to Faupel's residence, where she was staying. She did not have her phone or any money because her boyfriend was carrying her wallet and phone for her. The temperatures in Superior that night were at or near zero degrees Fahrenheit. Plaintiff was wearing leggings, socks, boots, a button-up shirt and a North Face coat, but she did not have a hat, gloves or mittens.

After plaintiff left Norm's Bar, she stopped briefly at Builder's Bar. She left the bar at 1:00 a.m., and remembers walking through what appeared to be "frozen tundra" and an "open field with railroad tracks." She got lost and fell into the snow more than once, hitting her knees and catching herself with her hands on the sharp, icy snow. (The parties have no evidence establishing how long plaintiff was outside in the cold.) Plaintiff does not recall what happened after that point until she came to later that morning in the Douglas County jail.

In the early morning hours of February 14, 2015, John Penney, a resident of Superior, reported to the Superior Police Department that an intoxicated woman he did not know had came into his house uninvited, was in his bed and would not leave. Defendants Kneisl and Letendre were on patrol in a squad car and were dispatched to Penney's home. Defendant Brown responded as backup. They found plaintiff lying in Penney's bed, wearing her coat and shoes, but no gloves or mittens. (Defendant Kneisl described plaintiff as wearing "shoes" when he and Letendre found her at Penney's, dkt. #52, at 43, but plaintiff testified that she was wearing "boots," dkt. #59, at 23. Without more information about the

particular footwear, the difference is inconsequential.) Kneisl does not recall that plaintiff's clothes were damp or torn. In his experience, officers often encountered persons going to and from bars without mittens, coats, boots or hats, so he did not believe that plaintiff's clothing was out of the ordinary for the weather. He believed that plaintiff was extremely intoxicated because she smelled of alcohol and was unable to tell tell him where she lived. Kneisl had almost daily experience dealing with intoxicated people and knew that an intoxicated person would have impaired judgment and be desensitized to pain.

The officers could not determine where plaintiff had been, with whom she had been or whom they could call to help her. Although they attempted to speak with plaintiff, she said very little beyond expressing a desire to stay where she was and sleep. The officers saw tissues and Vaseline around the bed and thought she might have been sexually assaulted. Having no other option, Kneisl arrested plaintiff at 1:48 p.m., and Letendre and Brown placed her in handcuffs.

Although plaintiff was intoxicated, she was able to stand and walk the six or seven steps from Penney's house to the squad car, which was running and heated. Letendre and Kneisl drove plaintiff 12 to 18 blocks to the Douglas County jail, where they performed the pre-booking process. Brown did not accompany plaintiff in the squad car or report to the jail.

Plaintiff, Letendre and Kneisl arrived at the jail and began plaintiff's pre-booking process at 2:07 a.m. The pre-booking interview was recorded on video tape. During the pre-booking process, Letendre asked plaintiff why she was so wet and cold, and plaintiff

responded that she had been outside walking along the railroad tracks. Letendre then attempted to interview plaintiff to determine why she was in Penney's house, how she got there and what path she had taken. Plaintiff did not have answers to these questions, but she complained about being wet and cold and said that her hands were cold and that they hurt. Neither Letendre nor Kneisl asked plaintiff expressly about her hand pain or how long she had been outside. However, the video shows that after plaintiff complained about hand pain a few times, Letendre helped plaintiff to a standing position, checked the tightness of her handcuffs and looked at her hands, which were handcuffed behind her back. He verbally noted that she had cuts on her hands. Letendre later testified that he did not see any redness or swelling in her hands, which would have been an indicator of frostbite. Plaintiff never asked the city police officers for medical attention.

During the pre-booking process, Kneisl was in the room searching on a computer for plaintiff's driver's license and correct address in order to make a positive identification. (Plaintiff provided several different addresses during the pre-booking process.) Kneisl also filled out the arrest record and booking paperwork. He did not see or observe any injuries on plaintiff. At 2:20 a.m., Kneisl walked plaintiff from the booking room to the jail and handed her and her arrest record over to the jail officer.

### E.  Plaintiff's Stay in the Douglas County Jail

From 6:00 p.m. on February 13, 2013 to 6:00 a.m. on February 14, 2015, Nichols was working at the jail. Davidson was working the 7:00 p.m. to 7:00 a.m. shift on the same

days.  Both officers conducted the intake process for plaintiff.  Nichols knew that plaintiff had been outside, that the weather was cold and that she did not have a hat or gloves. However, neither Kneisl nor Letendre told Nichols anything about plaintiff's being cold or complaining about her hands hurting.  The arrest record that Kneisl completed and gave to Nichols stated that plaintiff was not injured or in need of medical attention before or after her arrest.

During a medical screening of plaintiff, Nichols asked plaintiff whether she had any skin problems, whether she had been injured and whether she had any medical conditions the officers should be aware of.  Plaintiff responded "no" to all of these questions.  Both Nichols and Davidson noted redness and abrasions or scrapes on plaintiff's hands.  Plaintiff complained that her hands hurt, but Nichols did not note her complaint on the medical screening form.  The city police officers had told Davisdson and Nichols that plaintiff had been pounding on an apartment door.  Davidson and Nichols also noted that plaintiff appeared intoxicated: she used slurred speech at times, appeared emotional by yelling and crying at times, was unsteady on her feet and did not cooperate with the intake process. Plaintiff was too intoxicated to sign the inventory form or cooperate with the be fingerprinting and photographing process.

Nichols was responsible for checking on the inmates at the jail.  During one of these "well-being visits," Nichols talked with plaintiff about being in jail.  Nichols testified later that plaintiff might have complained about hand pain at that time but he did not recall

anything in particular. Nichols did not hear anything further from plaintiff before he went off duty at 6:00 a.m. In addition, no notes were recorded in the jail's computer program.

Officer Jamie Roberts's shift on February 14, 2015 started at 6:00 a.m. and included rounds or well-being checks on the detainees. Plaintiff did not eat the breakfast offered her around 6:30 a.m. to 7:00 a.m. on the morning of February 14, 2015. Although plaintiff cannot recall exactly what happened, she believes that she woke sometime after 6:00 a.m. and requested assistance for her hands and it took a "long time" for the officers to respond. Officer Roberts first saw plaintiff awake in her cell at around 8:30 a.m. Roberts asked plaintiff whether she was okay because she had a "weird" look on her face. Plaintiff expressed concern about her hands and showed them to Roberts. Roberts saw that her hands looked red, purple, swollen, bloody and blistered and immediately called Sergeant Edwards, who responded to plaintiff's cell. The officers tested plaintiff's blood alcohol content for the first time, finding it .05. Plaintiff told Roberts she had told officers about her hands the night before but that nothing had been done for her.

Plaintiff was released, but her hands were too badly frostbitten for her to sign the property release form. Officer Blix assisted plaintiff with getting dressed and then drove her to the hospital. Plaintiff received extensive treatment from both Essentia Health in Duluth, Minnesota, and at the University of Wisconsin Hospital and Clinics in Madison, Wisconsin. It was necessary to partially amputate one of her fingers and she has some residual scarring, stiffness and sensitivity in her affected fingers.

OPINION

Plaintiff contends that in ignoring clear signs of frostbite in her hands and failing to insure that she received prompt medical attention, defendants were responsible for the injuries to her fingers. In addition, plaintiff contends that the City of Superior and Douglas County failed both to institute sufficient policies and procedures for the identification and treatment of frostbite and to provide adequate training for their officers about the condition. Finally, plaintiff asserts a state law negligence claim of deliberate indifference against Douglas County. (Although the allegations of negligence in her first amended complaint are limited to Douglas County, dkt. #20, ¶ ¶ 40-45, the county defendants moved for summary judgment on this claim on behalf of all three county defendants, dkt. #63, pp. 11-13, and plaintiff responded with arguments applying to all of the defendants, Dkt. # 66, pp. 13-14. Because the individual defendants were not sued, I have ignored the arguments relating to the individual county defendants. )

A.  <u>Medical Care Claims</u>

Plaintiff analyzes her medical care claims under the deliberate indifference standard applicable to medical care claims arising under the due process clause of the Fourteenth Amendment, which applies to pre-trial detainees. However, because plaintiff was in custody less than 24 hours, she had not yet had the judicial determination of probable cause required under <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975), for persons detained in custody for 24 hours or longer. <u>Estate of Perry v. Wenzel</u>, 872 F.3d 439, 452-53 (7th Cir. 2017). Therefore, it

13

is the Fourth Amendment and not the Fourteenth Amendment which governs plaintiff's claims.  Id.; Currie v. Chhabra, 728 F.3d 626, 629 (7th Cir. 2013) ("Fourth Amendment's 'objectively unreasonable' standard [applies] to both 'conditions of confinement' and 'medical care' claims brought by arrestees who have not yet had their Gerstein hearing."); Sallenger v. City of Springfield, Illinois, 630 F.3d 499, 503 (7th Cir. 2010).

To succeed on her medical care claims, plaintiff must demonstrate that the officers' actions were "objectively unreasonable under the circumstances," a less demanding standard than the deliberate indifference standard.  Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir. 2007) (internal citation omitted).  Courts consider four factors in determining whether an officer's actions were objectively reasonable:  "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." Ortiz v. City of Chicago, 656 F.3d 523, 530 (7th Cir. 2011) (citing Williams, 509 F.3d at 403).  Defendants do not contend that taking plaintiff to the hospital or providing medical treatment to her would have been overly onerous or would have compromised any police interests.  Rather, their arguments focus on the first two factors, which require plaintiff to show that her medical needs were serious, that each individual defendant was on notice of her condition and defendants' failure to act was objectively unreasonable and caused plaintiff harm.  Id. at 530-31.

Defendants contend that a reasonable jury could not conclude that plaintiff's complaints and symptoms at the time of her arrest and booking at the Douglas County jail

were sufficient to place them on notice that she needed medical treatment for frostbite. Orlowski v. Milwaukee County, 872 F.3d 417, 423 (7th Cir. 2017) ("In hindsight, we are painfully aware of how serious Orlowski's medical condition was because his methadone overdose led to an untimely death. However, we must look at Orlowski's medical condition as Alexander observed it."). In the alternative, defendants assert that they are entitled to qualified immunity. Because I find that the individual defendants are entitled to summary judgment on plaintiff's medical care claims for the reasons explained below, it is unnecessary to address defendants' arguments regarding qualified immunity.

Officers can be placed on notice of a serious medical condition either by word or through observation of the detainee's physical symptoms. Estate of Perry, 872 F.3d at 454 (citing Williams, 509 F.3d at 403). In this case, the undisputed facts show that when Letendre and Kneisl responded to Penney's apartment and found plaintiff lying on Penney's bed, they learned that plaintiff was intoxicated, had been outside in the cold at some point and was not wearing gloves or mittens. Although plaintiff has provided no evidence to establish what Brown learned about plaintiff when he responded to the call at Penney's house, I will assume that he had the same information and knowledge as Letendre and Kneisl because he was in the apartment with them.

During the pre-booking process at the Douglas County jail, plaintiff complained to Letendre and Kneisl that she was cold and that her hands hurt. They observed that she was wet but they did not know how long she had been outside because she was too intoxicated to give them accurate information. A review of the video from the squad car and the pre-

booking process confirms that apart from making some vague complaints about being cold and her hands hurting when they were handcuffed behind her back, plaintiff did not say or do anything that would have given the officers reason to believe that she had any significant medical need or that she had been outside for long enough to put her at risk of developing frostbite.  In fact, despite Letendre's significant experience with frostbite, he saw only some cuts on plaintiff's hands when he checked them after she had she complained that they hurt. He saw no signs of frostbite.  In fact, the cuts that Letendre saw would have been consistent with plaintiff's reports of falling in the snow and Penney's reports that plaintiff had been pounding on his door. Although Nichols and Davidson observed redness and abrasions on plaintiff's hands and heard plaintiff say that her hands hurt, neither he nor Davidson learned or observed anything more than this during the booking process or the medical screening.

The only evidence in the record related to frostbite is the officers' testimony about the training they received and a brief excerpt from a Red Cross fact sheet, which was cited by plaintiff's expert witness, Suzanne Ward, who is a registered nurse.  (Apart from citing the Red Cross guide, Ward did not discuss the signs of frostbite or explain them.)  Nichols and Davidson testified that they were trained to look for severe discoloration of the skin, skin that is hard to the touch and complaints of pain.  The Red Cross guide similarly states that signs of frostbite include lack of feeling and waxy, cold or discolored skin.  It defines "discolored" as flushed, white, gray, yellow or blue.  At most, plaintiff's hands were red.  Although redness (or at least "flushed" skin) can be a sign of frostbite, it is not reasonable to conclude from the limited evidence in the record related to frostbite that this one physical symptom would have

put any of the defendants on notice that plaintiff had a medical condition in need of treatment.

Plaintiff's evidence establishes that the problems with her hands did not become obvious until more severe symptoms appeared at 6:00 a.m. or later. Although plaintiff points out that the officers reported that she did not sign the property inventory form or have her fingerprints taken during the booking process, the recorded reason for this was that she was too intoxicated. Plaintiff is unable to refute this because she does not recall what happened at the jail and there is no other evidence to support a finding that she had limited use of her hands.

Plaintiff also argues that Nichols acted unreasonably in failing to inquire about the condition of her hands during his well-being checks in the cell block throughout the early morning hours of February 14, 2015. However, for the same reasons discussed above, Nichols was not on notice that plaintiff had a medical need or that there was even a reason to ask her about her hands. Although plaintiff notes that Nichols admitted that plaintiff may have complained of hand pain at some point during his well-being checks, he does not recall this happening. For her part, plaintiff remembers alerting jail staff to the possible frostbite in her hands sometime between 6:00 a.m. and 8:30 a.m., which was after Nichols went off duty. There is no evidence that plaintiff was having any significant problem with her hands until Officer Roberts noticed at 8:30 a.m. that something was wrong. Without more, there is insufficient evidence from which a jury could conclude that Nichols was on notice that plaintiff's condition had worsened and required medical attention. Cf., Estate of Perry, 872

F.3d at 454 (summary judgment not proper as to medical care claim because officers had accompanied detainee to hospital where they observed detainee have multiple seizures and receive treatment and then expressed concerns about returning detainee to jail); Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005) (possible to infer guard knowingly disregarded warnings that serious harm could occur because he failed to investigate emergency call made by inmate).

As additional evidence that the officers acted unreasonably, plaintiff points to the expert opinion of Ward, who has more than ten years of clinical service in jails and prisons and who has run a consulting firm that addresses health-related matters and policies in correctional settings since 1999. From her review of the record and plaintiff's injuries, Ward concluded that plaintiff suffered from a serious medical condition when she was booked in the Douglas County jail and that defendants Letendre, Kneisl, Nichols and Davidson acted with deliberate indifference in not considering that plaintiff had frostbite. However, Ward fails to explain why plaintiff's condition at the time of arrest or booking would have put a lay person or even a trained paramedic like Letendre on notice of plaintiff's developing frostbite. Although Ward cites the minor abrasions and redness in plaintiff's hands and the fact that plaintiff had been outside without gloves, Ward does not state why she believes those facts by themselves meant that plaintiff had frostbite or would develop it later. She does not discuss the signs of frostbite in any detail or explain how long it takes to develop, what it looks like as it progresses or how it can be treated in either its early or late stages. Both plaintiff and Ward suggest that the severe condition of plaintiff's hands at 8:30 a.m. implies

that her need for medical attention would have been obvious at the time of arrest and booking, but neither identifies any evidence--medical or otherwise--to support such a suggestion.  An expert is entitled to offer a view on the ultimate issue in a case, Fed. R. Evid. 704(a), but "an expert's report that does nothing to substantiate this opinion is worthless, and therefore inadmissible."  Minasian v. Standard Chartered Bank, PLC, 109 F.3d 1212, 1216 (7th Cir. 1997).  See also Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

In sum, plaintiff's evidence is insufficient to create a genuine dispute of material fact with respect to whether the individual defendants had notice that plaintiff had a medical need.  Further, given what was known to the officers at the time of plaintiff's arrest and booking, a reasonable jury could not conclude that the officers should have sought immediate medical attention for plaintiff.  Accordingly, defendants Kneisl, Letendre, Brown, Nichols and Davidson are entitled to summary judgment with respect to plaintiff's medical care claims against them.

## B.  Government Liability Claims

Local government entities, such as municipalities and counties, may be held liable under § 1983 if "the unconstitutional act complained of is caused by:  (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final

policy-making authority." <u>Thomas v. Cook County Sheriff's Department</u>, 604 F.3d 293, 303 (7th Cir. 2010) (citing <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 690 (1978)).  Plaintiff has cited no evidence of an official policy, action, custom or practice that caused her injury, but she argues that the city and county had neither adequate policies and procedures nor proper training relating to the identification and treatment of frostbite in a climate where such injuries are common and slow to develop.  Such claims are governed by a deliberate indifference standard.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); <u>King v. Kramer</u>, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); <u>Jones v. City of Chicago</u>, 787 F.2d 200, 204 (7th Cir. 1986) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.").

Generally, a municipality cannot be liable under <u>Monell</u> when there is no underlying constitutional violation by a municipal employee, as in this case.  <u>Sallenger</u>, 630 F.3d at 504. However, the Court of Appeals for the Seventh Circuit held in a recent case that if municipal policies are deliberately indifferent to the quality of medical care provided to a detainee, the municipality may be liable even if its individual agents are not.  <u>Glisson v. Indiana Department of Corrections</u>, 849 F.3d 372, 378 (7th Cir. 2017) ("Without the full picture, each person might think that her decisions were an appropriate response to a problem; her

failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.").

The undisputed facts show that both the city and county had some policies and procedures relating to the medical needs of arrestees and that the county specifically trained its officers on how to identify frostbite. Plaintiff suggests that her injuries could have been prevented by a policy mandating a prompt medical examination when an officer knows someone has been exposed to extreme cold for a lengthy time, or for an undetermined amount of time, but she offers no evidence to support this contention. She merely alleges generally that the individual defendants in this case could have prevented her injury by bringing her to the hospital at the time of her arrest or booking.

Flawed policies or training amounts to deliberate indifference only if "the need for more or different [policies or] training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 388. As discussed above, I have found that plaintiff has not adduced sufficient evidence to create a genuine issue of fact about whether any of the individual defendants knew that plaintiff had a serious medical need. Plaintiff has not adduced any other evidence showing a deficiency in the city's or county's policies or training that could support a claim for deliberate indifference. Ward's conclusory expert opinion that defendants' policies and training are inadequate is not sufficient.

Proof of deliberate indifference requires more than "[a] showing of simple or even heightened negligence." Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 407 (1997). The Supreme Court has explained that there are several ways that a plaintiff may make this showing, including: (1) "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights"; and (2) a repeated pattern of constitutional violations makes "the need for further training . . . plainly obvious to the city policymakers." City of Canton, 489 U.S. at 390 and n.10. Plaintiff has not identified any other incident besides her own in which city or county officers failed to identify and obtain medical treatment for a person in their custody. She has no evidence that either the city or the county made a deliberate choice not to have a policy specifically relating to the identification or treatment of frostbite. Glisson, 849 F.3d at 379-80 (differentiating between defendant's conscious choice not to have policy on coordination of medical care and its inadvertence or failure to consider issue in first place). Without more, a reasonable jury could not conclude that either the city or county had actual or constructive knowledge that the need for a specific policy or further training on frostbite was "plainly obvious." City of Canton, 489 U.S. at 390 n. 10; Jenkins v. Bartlett, 487 F.3d 482, 492-93 (7th Cir. 2007). Accordingly, the municipal defendants are entitled to summary judgment with respect to plaintiff's claims that the City of Superior or Douglas County or both were deliberately indifferent to the possibility that she had suffered frostbite.

### C. State Law Negligence

Defendant Douglas County argues that plaintiff's negligence claim fails because defendant is immune from civil suit under Wis. Stat. § 893.80(4), which provides that "[n]o suit may be brought against any . . . governmental subdivision . . . for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Legislative, quasi-legislative, judicial and quasi-judicial acts have been "collectively interpreted to include any act that involves the exercise of discretion and judgment." Lodl v. Progressive Northern Ins. Co., 253 Wis.2d 323, 646 N.W.2d 314, 335 (2002). By contrast, "[a]n act is ministerial, and thus not discretionary and entitled to immunity, 'only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance.'" Estate of Williams v. City of Milwaukee, 2017 WL 3381235, at *24 (E.D. Wis. Aug. 4, 2017) (quoting Lister v. Board of Regents of University of Wisconsin System, 72 Wis. 2d 282, 240 N.W.2d 610, 622 (1976)). Defendant Douglas County argues that determining whether to provide medical care to a person in custody involves the exercise of discretion and judgment and does not qualify as a ministerial act.

In response, plaintiff contends that defendant's conduct falls within two exceptions to the discretionary immunity doctrine: the "known danger exception" and the "medical judgment" exception. She argues that the known danger of her developing frostbite created a ministerial duty for the county to treat her. However, for a known danger to create a ministerial duty, "the nature of the danger must be compelling, known to the municipality

and "of such force that the public officer has no discretion not to act." Kimps v. Hill, 200 Wis. 2d 1, 15, 546 N.W.2d 151, 158 (1996) (quoting C.L. v. Olson, 143 Wis. 2d 701, 715, 422 N.W.2d 614 (1988). As discussed above in the context of plaintiff's Fourth Amendment claims, the nature of the danger to plaintiff was not" compelling" or "known" to Nichols and Davidson. Although the officers observed that plaintiff's hands were red and had abrasions and they knew she had been outside at some point, they were told that plaintiff had been pounding on a door, which could have accounted for the abrasions. Because the nature of the danger posed to plaintiff "did not create a duty so 'clear and absolute' that it became ministerial," the county is entitled to immunity for the discretionary acts of Nichols and Davidson in the course of their duties as jailers. Id. at 16.

In a one-sentence argument, plaintiff contends that discretionary immunity does not apply because the defendants in this case were making medical judgments about whether she needed care. However, plaintiff fails to explain why she believes that this exception applies to Douglas County. Although Nichols was responsible for conducting a "medical screening" of plaintiff's condition, neither he nor Davidson was a medical professional, had any specialized medical training or was responsible for providing medical treatment. Scarpaci v. Milwaukee County, 96 Wis. 2d 663, 697-688 (1996) ("The theory behind immunity for quasi-judicial decisions does not dictate an extension of the immunity to cover the medical decisions of medical personnel employed by a governmental body."). Wisconsin courts have repeatedly refused to extend the exception identified in Scarpaci to defendants who are not medical professionals. Estate of Perry, 872 F.3d at 463 (citing DeFever v. City of Waukesha,

2007 WI App 266, ¶ 14-16, 306 Wis. 2d 766, 743 N.W.2d 848; <u>Kimps v. Hill</u>, 187 Wis. 2d 508, 523 N.W.2d 281, 285 (Ct. App. 1994)).  Douglas County is entitled to summary judgment with respect to plaintiff's negligence claim because the county is immune from suit under Wis. Stat. § 893.80(4).


ORDER

IT IS ORDERED that the motions for summary judgment filed by defendants Douglas County, Dan Nichols and Rich Davidson, dkt. #45, and defendants Gary Kneisl, Marc Letendre, Matt Brown and the City of Superior, dkt. #49, are GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 30th day of January, 2018.


BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge